UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re

DARREN and CYNDI WELTER,                                No. 15-10160

                    Debtor(s).
_____/

FLYNN and ENSLOW, INC.,

                    Plaintiff(s),

            v.                                         A.P. No. 15-1044

DARREN A. WELTER,

                    Defendant(s).
_____/

Memorandum After Trial
_____

I. Introduction

      From 1993 to 2012, Chapter 13 debtor and defendant Darren Welter was the key employee of plaintiff Flynn and Enslow, Inc., ("FE") a distributor of wire mesh products. In the early years of his employment, Welter worked closely with Larry Enslow, who owned FE along with his wife, Lois. Larry Enslow actively and directly managed FE's business.

1

Although FE was primarily a distributor, some of its customers asked for cutting, welding and other special services. Welter had the necessary skills to perform these services, and volunteered to do them even though it would result in working evenings and weekends. However, Larry Enslow did not want to pay the overtime expenses. He therefore came up with an arrangement whereby Welter would perform the special services under the name "Cal-Fab." Welter was to perform the extra work and present FE with an invoice, which FE would pay as if Welter was an outside company.

The death of Larry Enslow in 1996 left FE rudderless. His widow, Lois Enslow, expressed little interest in FE beyond receiving her monthly rent check, as she was FE's lessor. She told FE's controller, Elizabeth Keith, that she would not invest anything further in FE and that if FE could not continue without contributions from her it should be shut down.

Welter stepped in to fill the void left by the death of Larry Enslow. He became vice president and was effectively the manager of the entire company, handling all its operations. Welter kept FE operating for about 15 years, without any influx of capital from Lois Enslow or anyone else. All during this time, Welter continued to provide special services as Cal-Fab, billing FE and being paid as a vendor.

In the early 2000's, FE was having cash flow problems and difficulty paying its bills. Lois Enslow hired Michael Gilbert of Gilbert & Company, a certified public accounting firm, to be FE's accountant and business advisor. Gilbert determined that the work Welter was doing as Cal-Fab needed to be brought in to FE, and expressed this opinion to Welter on several occasions. At one time, there were discussions about the employees of FE purchasing the business from Lois Enslow, and Gilbert noted that a condition of the sale must be that the work Welter was doing as Cal-Fab needed to be folded back into FE. However, in early 2008 Lois Enslow decided that Gilbert's services were to expensive and fired him. No changes were implemented, and Welter continued to provide services as Cal-Fab. These amounted to an average of about $56,000.00 per year.

It is important to note that at all times Welter's work as Cal-Fab was open and honest and done with full knowledge of not only FE's controller and accountants but everyone in the company. Welter

2

was issued 1099 forms and normal accounting procedures were employed. There was nothing secret, and Welter continued to perform services and bill FE just as he had been directed by Larry Enslow in 1993. Lois Enslow herself was fully aware of the arrangement and never objected to it. In fact, her thoughts about Cal-Fab were only expressions of concern for Welter's safety and FE's liability if something should happen to him when he was working after hours.

By 2012, Lois Enslow was no longer competent to handle her affairs and control of FE passed to her daughter, Kimberly Fox-Yoder, who re-hired Gilbert. Discussions regarding folding Cal-Fab into FE did not result in an agreement, and Welter's employment was terminated. In 2013, FE sued Welter in state court for alleged damages arising out of his work as Cal-Fab. Welter filed his Chapter 13 bankruptcy petition on February 18, 2014. FE then pursued Welter into this court, alleging in this adversary proceeding that its claims against him are nondischargeable pursuant to § 523(a)(2) of the Bankruptcy Code account of fraud, and pursuant to § 523(a)(4) on account of breach of fiduciary duty, embezzlement and larceny. The court has tried this matter, and for the reasons stated below finds no merit to FE's accusations.

II. Fraud

FE did not attempt to prove its fraud allegations, as there was nothing to them. Fundamental to a fraud claim is either a lie or intentional concealment of a fact the defendant has a duty to disclose. In this case, FE did not produced any evidence of either. Everyone, from the ownership of FE through its accountants and controller and right down to the lowest warehouse worker, knew everything there was to know about Welter and Cal-Fab. There was neither misrepresentation or concealment, so there can be no fraud.

III. Embezzlement

FE argues that Welter committed embezzlement by billing FE for Cal-Fab work. This argument is premised on the assertion that Welter was instructed to cease Cal-Fab work and billing in

3

2007, so that it is entitled to recover as damages every penny it paid on account of a Cal-Fab invoice from 2007 until Welter's termination in 2012. Not only would such conduct, if true, entitle FE to nothing as a matter of law, but the factual basis for the claim was refuted by FE's own witness.

If an employee is instructed to stop a practice and openly refuses, there is no resulting nondischargeable debt for embezzlement or anything else. The employer's remedy is to terminate the employee, not continue knowingly to pay him and then call it embezzlement and seek to get all the payments back. Welter continued to bill FE as Cal-Fab just as he always had. Its controller - not accused of any wrongdoing by FE - continued to verify Welter's work, pay him, report the transactions to FE's accountants and issue annual 1099 forms for the work. This was not a secret to anybody.[1] There is no basis in the law for calling such conduct embezzlement, let alone recovering every penny paid without offset for the value of the work.

The only case FE was able to find to supposedly support its legal position is a decision by Bankruptcy Judge William Hill, *In re Montgomery,* 236 B.R. 914 (Bkrtcy.N.Dak.1999). The case in no way supports FE's position. In that case, Judge Hill rejected an employer's claims against a former employee for RICO claims, defalcation in a fiduciary capacity, fraud, and larceny. It found a small portion of the employer's claims nondischargeable as embezzlement because the employee had allowed the employer's property to be used for a purpose other than that for which it had been entrusted and - critically - *concealed the unauthorized activities from the employer.* 236 B.R. at 924. In this case, Welter's conduct was both fully authorized by FE and unconcealed in any way. Thus, Judge Hill's decision in *Montgomery* does not support FE's position.

Not only is there no legal basis for FE's claims, but FE's principal witness, Michael Gilbert, refuted the idea that Welter was told to cease and desist his operations as Cal-Fab. Under questioning by Welter's counsel, he testified:

---

[1] FE accuses Welter of "double dipping" because he did some Cal-Fab work during regular business hours. However, this was in no way a secret. It was a normal part of Welter's compensation.

4

1       Q. Did you ever write a letter ordering Darren to cease and desist the Cal-Fab operations?

2       A. I don't know if there was an actual letter saying cease and desist. I don't think
that was beneficial to the company. We weren't looking for a cease and desist. We were
looking for Cal-Fab, which was providing a service that Flynn and Enslow could provide,
to be where it belonged, and that was with Flynn and Enslow. Why would you take a
revenue stream and say cease and desist this revenue stream? That made no logical
sense. So no, I would not have written that letter. My letters and emails . . . were always
about bringing them together. That's a revenue stream and you don't want to cut off a
revenue stream economically.

      Q. So you never told Darren Welter to stop Cal-Fab?

      A. No. There is no reason to stop that. We wrote letters saying it needed to be
incorporated.

Despite this testimony from its own prime witness, counsel for FE argued all through the case and right up to closing argument that Welter was ordered to cease and desist his Cal-Fab operations.[2] No evidence supported such an allegation.

It is clear from testimony of FE's own witnesses that bringing Welter's Cal-Fab business into FE's main operations was not a simple matter of telling Welter to "cease and desist." When FE finally brought the Cal-Fab work into its operations, after Welter was terminated, it took many months, three or four additional employees, and tens of thousands of dollars in new equipment. Moreover, Welter's Cal-Fab income had been part of his compensation for 15 years; unilaterally ceasing to pay the Cal-Fab invoices would have been the equivalent of a large pay cut.

FE could have brought Welter's Cal-Fab work into its operations at any time by sitting down with Welter and reaching a new compensation arrangement with him. FE never did this, because it

---

[2] For instance, FE's counsel alleged in responding to Welter's motion for summary judgment that "Michael Gilbert . . . specifically instructed Welter in 2007 to bring Cal-Fab in as part of FEI's business or stop running Cal-Fab altogether." 6:11-13. Gilbert himself refuted this allegation.

5

would have entailed a significant capital investment which FE was unwilling to make at the time. Lois Enslow instead chose to terminate Gilbert and maintain the status quo. There is no justification for calling Welter a thief and demanding that he return everything FE knowingly and willingly paid him for his Cal-Fab work.

IV. Larceny

    A. Missing Equipment

While Welter was its vice president, FE acquired the assets of a similar business in Los Angeles. Eventually it was decided that the employees at the Los Angles facility would be laid off and its equipment moved to FE's Long Beach facility. As the vice president and only real manager of FE, Welter was in overall charge of the move even though he was usually at FE's San Francisco location. Some of the equipment apparently did not arrive at the Long Beach facility, though there is no inventory of the missing equipment nor any credible and competent evidence of its value. FE not only blames Welter for the missing equipment, but asserts without evidence that he stole it.

The undisputed testimony was that Welter was "spread thin," so it is entirely possible he could be called negligent for his supervision of the move. Negligence, however, is not a basis for declaring a debt nondischargeable. There is no evidence that Welter ended up with the missing equipment. It is far more likely that the Los Angeles employees, who knew they were being laid off, were responsible for the missing equipment.

    B. Missing Product

After FE fired Welter, they undertook a review of all payments FE had made to Welter for his Cal-Fab work. Of the several hundred Cal-Fab invoices FE reviewed, it identified two invoices, for $2,500 each, which it says it paid without receiving the materials. Based on nothing more, FE again calls Welter a thief.

It does appear that the material, which Welter worked on in San Francisco, never showed up at the Long Beach facility where it was needed. However, proving that it was never received does not

6

prove that Welter created fake invoices with the intent to cheat FE. A plaintiff seeking a nondischargeable judgment under § 523(a)(4) of the Bankruptcy Code must prove that the debtor acted with wrongful intent. *Bullock v. BankChampaign, N.A.,* 569 U.S. —, 185 L.Ed.2d 922, 925, 133 S.Ct. 1754 (2013). Nothing in the evidence justifies the court finding that Welter created false invoices or acted with wrongful intent.

V. Welter's Counterclaim

Welter has filed a counterclaim in this adversary proceeding alleging breach of contract and other causes of action. They are not related to the issue of dischargeability, nor are they in any way based on bankruptcy law. FE has a right to a jury trial on these claims. The court ordered that it would hold trial on the complaint only and deal with the counterclaim thereafter. The court elects to sever the counterclaim, abstain from it pursuant to 28 U.S.C. § 1334(c)(1), and dismiss it without prejudice.

VI. Conclusion

FE has failed to prove any nondischargeable debt owed to it by Welter. Accordingly, it will take nothing by its complaint, which the court will dismiss with prejudice. Welter shall recover his costs of suit. Welter's counterclaim will be dismissed without prejudice.

This memorandum constitutes the court's findings and conclusions pursuant to FRCP 52(a) and FRBP 7052. The court will enter an appropriate judgment.

Dated: February 29, 2016

Alan Jaroslovsky
U.S. Bankruptcy Judge